9 So.2d 768

**NEWMAN v. STATE.**

. 4 Div. 668.

Court of Appeals of Alabama.

March 17, 1942.

Rehearing Denied June 2, 1942.

530

Chauncey Sparks, of Eufaula, for appellant.

BRICKEN, Presiding Judge.

The prosecution in this case is based upon the following indictment, omitting formal parts and endorsements:

"Indictment for Arson 3rd. Degree.

| "The State of Alabama, "Barbour County | Circuit Court, Fall Term, 1940 At Eufaula, Alabama |
|---|---|

"The Grand Jury of said County charge that before the finding of this indictment and since the 1st day of January 1940, that Fred Newman and C. D. Brown, whose Christian name is to the grand jury unknown, willfully or with intent to charge, injure or defraud the insurer, set fire to the following personal property; one 1940 Model Plymouth automobile, the property of the said Fred Newman, which property was at the time insured against loss or damage by fire against the peace and dignity of the State of Alabama."

Before entering upon the trial, the record discloses that the defendant, Fred Newman (appellant), prayed for, and was granted, a severance.

Also, before pleading to the merits, the defendant demurred to the indictment upon the following grounds:

"Now comes the defendant, Fred Newman, and demurs to the indictment in this cause and for grounds of demurrer, assigns the following:

"1st. Said indictment charges no crime.

"2nd. Said indictment is not sufficient in its averments to charge the defendant with any crime known to the laws of Alabama.

"3rd. Said indictment is defective in that it fails to name the insurer.

"4th. Said indictment is defective and therefore void, for failure to name the insurer.

Thos. S. Lawson, Atty. Gen., and John J. Haynes and Walter W. Flowers, Asst. Attys. Gen., for the State.

"5th. The indictment fails to name the insurer whom, it is charged, the defendant intended to charge, injure, or defraud.

"6th. Under the statute creating the crime here laid against the defendant, it is necessary to allege the insurer of the property burned; and this the indictment fails to do."

In this connection the trial court made and entered the following order, as shown by the judgment entry, viz.: "The defendant in open Court demurs to the indictment, and the Court considers said demurrers and it is ordered and adjudged by the Court that the demurrers to the indictment be and they are hereby overruled, and to the action of the Court the defendant excepts."

On this appeal, able counsel for appellant, forcefully and elaborately argues the above stated ruling of the court and strenuously insists that error prevailed in overruling the demurrers.

█ The propositions raised by the demurrers are practically identical with those involved and presented in the case of Dean v. State, 29 Ala.App. 401, 197 So. 51, wherein the views of this court were expressed by our lamented associate, Judge SAMFORD, and which, as therein appears, were in line with the insistences here presented by counsel for appellant. However, upon certiorari to the Supreme Court, that court granted the writ, and held that the opinion of this court was in error. See Dean v. State, 240 Ala. 8, 197 So. 53. The opinion of the Supreme Court prevailed under the provisions of Section 7318 of the Code of Alabama 1923, Code 1940, Tit. 13, § 95, and as we see it, said opinion is a complete answer to the insistences here urged, in the instant case; hence it appears, no further discussion of these questions is necessary. Upon authority of the Supreme Court's decision in the Dean case, supra, we perforce must, and do, hold there was no error in the action of the trial court in overruling the demurrers, above quoted.

The statement of facts, incorporated in appellant's brief, appears, in the main, to be borne out by the record. As stated in said brief they are as follows:

. "The defendant, Newman, owned a Plymouth four door sedan, which he bought in January, 1940, at Columbus, Georgia. The purchase price of the car was financed through the Commercial Credit Company, and there was at the time of the fire, balance owing on the purchase price and one defaulted monthly installment. The testimony of the State consisted largely of the confession of the co-conspirator, Brown. He testified that Newman told him, Brown, that he, Newman, would give Brown his account at Newman's store if Brown would burn up the Plymouth automobile. The amount of the account testified to by Newman (Brown did not know) amounted to $1.90, according to the books of Newman. Brown then took the car and left the place of business of the defendant, Newman, and went around a side road and just as he was coming back into the main highway, the car turned over and burned up. He explained that he had saturated the car with gasoline, two gallons of which, or approximately two gallons, he had obtained at Newman's filling station, and that he put on brakes and the car was dragged to one side, struck a bank and turned over. After it had turned over, as shown by cross examination of this witness, he struck a match, threw it in the car at the only window then open and it immediately blazed up from the evaporated gasoline which he had poured in there some minutes before.

"Newman, defendant, denied any agreement to burn, intention to burn, or any desire to burn. He stated that the boy, Brown, came to him and informed him that someone down the road was out of gas and wanted a couple of gallons. Newman told Brown that his gasoline can was out then and for Brown and Newman's son, Herman, to put two gallons in a water bucket and take it to the stalled car. Herman Newman and Brown pumped out approximately two gallons, all there was in the tank, and put it in the car, and Brown drove off in the opposite direction from the spot at which the car burned. The water bucket was found out in a field some 30, 40 or 50 yards from the point where the car burned. Brown stated that he drove with one hand, emptied the water can with the other hand, and then threw the water can over into a field, all the while driving the vehicle.

"Brown denied the burning at first, stating it was accidental. He made contrary statements often, according to testimony of defendant."

As will be noted, the conviction of the defendant rested and was had upon the testimony of Brown, the accomplice, and admitted culprit who set fire to the automobile.

The paramount question of fact upon this appeal is whether or not there was sufficient evidence offered upon the trial to meet the required rule fixed by statute which provides: "A conviction of felony cannot be had on the testimony of an accomplice, unless corroborated by other evidence tending to connect the defendant with the commission of the offense; and such corroborative evidence, if it merely shows the commission of the offense or the circumstances thereof, is not sufficient." Section 5635, Code 1923, Code 1940, Tit. 15, § 307.

Upon the trial below, the defendant took the position that there was not sufficient corroboration, and by every known means sought to have the trial court to so hold. On this appeal this insistence is urgently renewed, and a large number of the assignments of error are predicated upon this proposition.

 Under the long established and oft announced rule, the province of the court, in connection with the foregoing, was confined to the ascertainment, from the testimony, whether or not, as a matter of law, there was any evidence adduced upon the trial which tended to meet the requirement or provisions of the statute, supra. If the court so ascertained, it was his duty to submit such evidence to the jury for its consideration and determination. In other words, whether or not there was evidence corroborating the accomplice witness, tending to connect the defendant with the commission of the offense, is a question of law; its weight and sufficiency, along with the testimony of the accomplice to show the defendant's guilt beyond a reasonable doubt, were questions for the jury.

In Berry v. State, 231 Ala. 437, 165 So. 97, 99, the court said: "The testimony relied upon to corroborate the accomplice must, of course, tend to connect the defendant with the commission of the offense; but it is not essential that it should refer to 'any statement or fact testified to by the accomplice.' The purpose of the corroboration is not necessarily to prove the defendant is guilty, but to strengthen the credibility of the testimony of the accomplice. If the corroborating testimony strengthens the probative incriminatory force of the accomplice's testimony, and tends to connect the defendant with the commission of the offense, it is sufficient to warrant the submission of the issue involving guilt or innocence to the jury. Smith

v. State, supra [230 Ala. 413, 161 Só. 538]; Malachi v. State, 89 Ala. 134, 8 So. 104."

On this appeal the State contends there was not only evidence of corroboration sufficient to justify the trial court in submitting this question to the jury, over the several objections and exceptions of defendant; but also ample to support the verdict of the jury and sustain the judgment of conviction, from which this appeal was taken.

In this connection it is insisted that there appears nowhere in the testimony anything tending to show that Brown had any reason or motive in setting fire to the automobile, except that stated in his testimony. It is further insisted that the physical facts attending the act of setting fire to the car bear out in detail the statement of Brown, the accomplice, as to how the act was committed. It affirmatively appears from the evidence that, as Brown stated, the back part of the automobile had been saturated with gasoline, and further, that the water can, admittedly belonging to defendant, was found, not in the car, but over in the field some distance away where the accomplice stated he had thrown it, after emptying the gasoline all over the back of the car. Other evidence tending to incriminate this defendant was given by several witnesses. We deem it advisable to quote from the record some of the testimony in this connection.

State witness Kitchens testified, among other things, that he is a member of the Alabama Highway Patrol: "I know C. D. Brown. He was arrested that night. After we arrested him, we brought him here to the police headquarters and talked to him. While we were talking to him, Fred Newman came there. I would say it was around eleven o'clock when he came there. We were sitting there talking, I was on one side of the table and C. D. was on the other and Ward was to my left; and we were questioning C. D. about his activities for the afternoon and night and Fred came rushing in and sat down near the end of the table and said, 'What you got C. D. for?' I said, 'Well, that happens to be our business, what we've got him for, Fred.' And he said, well, he wanted to see him; I said, 'Well, we're talking to him now, when we get through we'll let you talk to him,' and he frowned at me and walked out and said, 'Well, I didn't mean it that way,' and I said, 'I mean just what I said,' and

he walked on out and I didn't see him any more. That was about twelve-thirty. He frowned when I wouldn't let him talk to him."

State witness H. A. Page testified:

"I am Chief of the Eufaula Fire Department. I made an investigation of the burning of an automobile which was the property of Fred Newman. I got a call to go out to where it was burning between five and six o'clock that Monday morning. The car had burned at that time. I went out there with Mr. Richardson and Mr. Herron, the policeman. * * * The fire had been extinguished when I got there. I made an investigation of that fire and of the car. I made an examination of it. I have been a fire chief, or fireman, for about 13 years. Since that time I have had experience in investigating fires. Fires that are caused by gasoline. A fire that had gasoline or kerosene either one on it, you can tell it by the odor of it. There is another way other than that that you can tell whether a fire was caused by gasoline or kerosene—you can taste it in the ashes. I have made a study of that kind of science. All of the upholstering, the interior, and the back rear tires of that car were burned; the motor was not burned at all; the wires were burned just inside the motor, but the wiring on the motor was not burned at all. The interior had been burned, all of the seats and everything. I tasted some of the ashes inside that car. It was just the taste of gasoline; in other words, it doesn't taste exactly like raw gas, but there's a taste there that you can tell. I smelled around in there. You can't tell much about it that way unless you wet the ashes some way.

"Thereupon, the State, through its Solicitor, asked the witness the following question:

"Q. Have you any judgment, based upon the experience you have had as a fire chief, as to whether or not that fire was caused by gasoline or whether or not gasoline was used in starting that fire? A. It had had gasoline on it.

"There was not any kind of container found around there right at that time. Later, C. D. Brown carried us out there and got the container. It was about fifty feet below the car, where the car burned, over in a corn field, twelve or fifteen feet in the corn field."

Witness Ward Richardson testified, among other things: "I am a member of the police force here in the City of Eufaula. I recall the occasion when its alleged that Fred Newman and C. D. Brown burned a car. I made an investigation of that fire, with the Highway patrolman, Mr. Kitchens. It was sometime about eight-thirty at night when we went there. * * * Fred Newman runs a filling station out there. * * I imagine possibly the car that was burning was a good quarter of a mile from Fred Newman's filling station. * * * When I got there the cushions and inside of it had already burned and the back part was burning then, around the gas tank. * * * I saw C. D. Brown out there. He was there when we first got there. We arrested C. D. Brown out there after Fred Newman had gone; Fred was leaving when we got there; we talked to C. D. a few minutes and put him under arrest. Fred Newman left there after we got there. The car had burned up at that time. There was just little blazes around and the gas tank on the back. We took C. D. to jail after we arrested him. We brought C. D. Brown to the Courthouse after I placed him under arrest. I later saw Fred Newman. He came down there in the police room. * * * I had C. D. in jail, and then we came back to the courthouse. We came back and got C. D. Brown out of jail and carried him in the police office and in a few minutes Fred Newman came in there, about ten o'clock. He came in and wanted to know what we had C. D. for, and Mr. Kitchens told him that was our business, to go on out, and if he wanted to see us he could see us later; and he left and came back at two o'clock, two A. M., on the 12th, that was on Sunday morning. At that time we had put Brown back in jail. When Fred Newman came back at two A. M., I think I met him in the hall, or in the police office. He said he wanted a bond for C. D. I told him he'd have to get a bond from Roscoe or Bill, one of the deputies, and he said all right. * * * Well, Fred Newman came back. That made the third time he had been here to the courthouse. * * * That was the third time. The third time he came there he said he wanted to talk to C. D. He wanted to go out there and talk to him and see if his wife knew he was in jail and see if he had cigarets and matches and so on. I went on out there with him, to the jail. When he got out there, he asked C. D. if he was hurt and he told him no; he says, 'Does your wife know you're in here?' and he said yes; and C. D. asked him for some matches and I hand-

ed him some matches myself, and Fred squatted down right in front of the door and I stepped around to his right side and he closed that right eye, if he was battin' it he kept it closed a mighty long time. It was like a wink. Fred Newman did that to C. D. C. D. didn't say anything; I looked at C. D. and C. D. grinned. Fred stooped down and winked at C. D., and C. D. grinned. And Fred came on down the steps and turned around and asked C. D. if he had cigarets and if there was anything else he could do, and he said, 'I'll get a bond for you in the morning.' That was all that happened. He left. * * * ' Fred Newman came down here to the jail or to police headquarters three times after Brown was arrested; the third time was the night he was in jail. I was with him when he talked to Brown."

The defendant (appellant) testified in his own behalf. He stated:

"I am the defendant in this case. I have heard the testimony so far. I did not have anything to do with the burning of that car. I did not hire Brown to burn it. I did not offer to give him his account if he would burn it.

"The next time I saw Brown, I saw him in the jail house. It was sometime around midnight. * * * That is the time they say I winked at him. I did not wink at him. I went there to talk to him. I asked him why they had him in there. He said he didn't know. I did not see him any more until the next morning. It was when they brought him from there up in the courthouse. Brown asked me to get a bond for him. I asked Ward Richardson could I get a bond for him and he said, 'You can't.' Brown says, 'Will you get a bond for me?' I said, 'I don't know whether I can or not, I'll ask Ward,' and I did ask him and he said, 'No, he can't get no bond at all.' "

On cross-examination defendant testified: "I didn't see Ward Richardson and Mr. Kitchens. I was at Pappas' Cafe when I found out that Brown was in jail. I came on pretty quick to the courthouse. I did not walk in there where Mr. Kitchens and Ward were talking to him and asked them what they had him for. I didn't go in police headquarters down here and Mr. Kitchens and Ward Richardson had Brown in there. I didn't do that. I heard them testify that I came in there and asked them what they had him for. I asked them, but Brown wasn't in there. They told me that was their business. I don't know where

Brown was at that time. That was the first trip I made down here. I did not know they had Brown under arrest. They didn't tell me they had him under arrest. Brown wasn't in the room there with them. When I went to get this bond he wasn't. I didn't turn around and get mad and frown. * * I saw Brown that time. He was in jail. It was sometime after midnight. I just went to the jail to see what Brown was in for. I wasn't so interested in Brown that night. I didn't go out there and ask him if he needed anything or if he wanted any cigarets. I didn't tell him I'd make his bond in the morning. I didn't turn and look at him and wink and he didn't smile at me. That was the only time I went to the jail. I come here to the courthouse—the last time I come I went to the jail. I came here twice. I came again the next morning at seven o'clock. I came to Court. No, I didn't come here at seven. The first time I come that morning, I come with Ward. I didn't know, as a matter of fact, that I came here three times that night. And I don't know that every time I came I wanted to talk to Brown. And I didn't ask if there was anything I could do for him, or if I could get him some cigarets. I didn't tell him not to get discouraged, I'd make a bond for him. And I didn't wink at him. I don't know, as a matter of fact, that I wanted to get to Brown and talk to him before the officers got him."

On direct examination defendant testified: "I bought that car from W. T. Patterson, Columbus. I was living there at the time. I did not take out any insurance on this car. No insurance policy was ever sent to me. I never did get an insurance policy by hand or by mail. At the time I did not know whether there was any insurance against it or not. The only thing I paid is the carrying charges, and it was added to the bill of sale, and that's the only thing I paid for. The carrying charges included insurance. However, it doesn't say on this (indicating a paper-writing to which he refers). This is a bill of sale of the car I got. This is the only statement I ever got. That doesn't show that the insurance is charged in it. But it does show the whole finance charge of a hundred and fifty-six dollars."

Thereupon the defendant introduced in evidence said bill of sale, which is signed by Fred Newman, as purchaser of the car in question and is set out in full in this record. Said contract, or bill of sale, pro-

vides in one paragraph the following: "Purchaser shall keep said car insured against fire and theft, payable to and protecting Seller for not less than the total amount owing on said note until fully paid. Purchaser will keep said car insured against the collision hazard, if requested to do so by Seller. Seller may place any or all of such insurance at Purchaser's expense, if Seller so elects. Seller may cancel any or all of such insurance at any time and shall receive the return premium, if any, therefor."

Defendant testified further: "I know Mr. Castellow. I know where his office is in Columbus. I went into his office within the last thirty days with Cullen Walker. I did not say to him at that time and place, 'This is the first case I've ever seen where a man had an insurance policy and the adjuster didn't come to see him about it.' I did not ask him at that time and place about how and when I could collect insurance on that car that burned."

F. M. Castellow, the first witness examined by the State, was recalled in rebuttal, and testified as follows: "I testified that I know Fred Newman. Within the last thirty days he came into my office in Columbus, in company with a man named Walker and then and there asked me, in substance, or stated to me in substance, 'This is the first case I've ever seen where a man had an insurance policy and the Adjuster didn't come to see him about it.' At that time, he discussed with me a claim for insurance that he had on that car that was burned." And on cross-examination Mr. Castellow testified: "He said that the insurance Adjuster hadn't been to see him and he wanted to know something about it; the gentlemen that was with him said they had a claim on the insurance and they had found out a day or two before that the salvage had been sold, and he wanted to know why the insurance Adjuster hadn't been to see him. * * * He wanted to know about his insurance; he had a policy on his car. * * * He asked me about the policy and I told him there was one and he told me then that the Adjuster had never come to see him."

From the foregoing testimony, which we have quoted, we are clear to the conclusion that the trial court ruled correctly in determining there was evidence adduced upon the trial which corroborated, under the required rule, supra, the testimony of the admitted accomplice (Brown),

hence, as stated, it was the duty of the court, to submit this testimony, and the case, to the jury for its consideration and determination. We are further of the opinion that under numerous decisions by the Supreme Court of this State, said testimony was ample and sufficient to warrant and sustain the jury in rendering its verdict.

We advisedly quoted at unusual length the pertinent testimony as to the controlling question in this case, for the reason if review, by certiorari, is had, the reviewing court may be fully informed as to the attendant facts upon which we base our conclusion above announced. Slayton v. State, 234 Ala. 1, 173 So. 642; Slayton v. State, 234 Ala. 9, 173 So. 645, and cases cited. Berry v. State, 231 Ala. 437, 165 So. 97.

In submitting this case to the jury, the trial judge delivered a full and comprehensive oral charge; and, in addition thereto, gave at the request of the defendant several written special charges. Thus, we think, every phase of pertinent law involved in this case was properly given to the jury as instruction by the court. A number of special written charges were refused to defendant, several of which have been disposed of by what has been said hereinabove. We see no necessity to discuss in detail the remaining refused special written charges. We have, however, carefully examined all of them and are of the opinion that the court's oral charge, coupled with the given charges at request of defendant, fairly and substantially covered such of the refused charges that properly stated the law of this case.

There were exceptions, also, reserved to the court's rulings upon the admission and rejection of evidence. These we have carefully examined, but have failed to find any of these rulings infected with prejudicial error sufficient to require this court to reverse the judgment of conviction from which this appeal was taken. Turner v. State, 29 Ala.App. 13, 191 So. 392; Turner v. State, 238 Ala. 352, 191 So. 396; Supreme Court Rule 45.

We have hereinabove stated the controlling question in this case, in the court below, and likewise here on appeal, is whether or not there was sufficient corroboration of the testimony of the accomplice to meet the required rule of the Statute above quoted. Certainly, it must be conceded, if the testimony of the accomplice Brown is true, this appellant should be

called upon to bear the burden of his wrong doing, as testified to by Brown.

In considering the testimony above quoted, and that contained in the record unquoted, so far as we can see, there is nothing in any of the evidence tending to show any reason or motive Brown could have had for his admitted act in setting fire to the car, except that given by Brown in his testimony upon the trial. Further, the active interest and patent anxiety of Newman, relative to Brown, on the night of the commission of the offense, as testified to by the officers of the law and others, but denied by defendant. And still further, his testimony to the effect he did not know there was any insurance on the car, and his direct denial of the testimony given on this question by witness Castellow. All this, and other facts of like import, must impress a reasonable mind that upon all the testimony adduced upon the trial of this case a jury question was presented, and the action of the jury being warranted in this connection and conclusive of this case, it follows, in the absence of prejudicial error in the court's rulings, which, as stated, are not apparent, the judgment of conviction from which this appeal was taken must, perforce, be affirmed. It is so ordered.

Affirmed.

. SIMPSON, Judge (concurring).

I concur in the conclusions stated in the opinion by our Presiding Judge and wish to respectfully add the following:

As to the objection, so forcefully argued, that the statute under which the prosecution was laid is' unconstitutional, it is observed that this question was not specifically raised by the demurrers. Nevertheless, the better rule seems to be that the constitutionality of a statute upon which a criminal prosecution is based may be raised, for the first time, at any stage of the proceedings, either in the trial court or on appeal. Davis v. State, 28 Ala.App. 348, 185 So. 771, certiorari denied 237 Ala. 143, 185 So. 774; 12 C.J. 786; 16 C.J.S., Constitutional Law, § 96. Hence this comment.

Counsel urges a striking down of Section 3294, Code 1923, as amended by General Acts 1927, p. 552, Code 1940, Tit. 14, § 28 (upon which this prosecution was based), on the ground that the amendment of 1927 was not germane in subject matter to that dealt with in the original section (3294).

The following clause of Section 45 of our State Constitution is alleged to have been infracted: "No law shall be revived, amended, or the provisions thereof extended or conferred, by reference to its title only."

■ The law is that a Code Section under a title may be amended by reference to the number thereof, when the amended matter is germane and supplemental thereto, suggested by, and cognate with the general matter and subject of the original section. McCoy v. Jefferson County, 232 Ala. 651, 653, 169 So. 304; City of Birmingham v. Merchants Cigar & Candy Co., 235 Ala. 204, 178 So. 220.

■ Using these authorities to test the constitutionality of the 1927 amendment of the arson statute, above, it is my view that the clause of our Constitution quoted hereinabove has in no way been violated.

The section (3294), prior to the amendment, dealt with arson, viz., the willfully burning (or with intent to burn, the setting fire to) of any property which at the time is insured against fire, with intent to charge, injure or defraud the insurer.

The section as amended (now Code 1940, Title 14, Section 28) is in no sense a departure in substance from the original. The matter contained in the amendment seems to be in all respects germane and supplemental to, suggested by, and cognate with the general matter and the subject of the original section.

Therefore, irrespective of whether or not the decision by our Supreme Court in the Dean case, cited hereinabove, was intended also to conclude this constitutional question, it seems to me that the point urged by able counsel for appellant is untenable.

The proposition that the indictment should have named the insurer alleged to have been defrauded, aside from the conclusiveness of the opinion of the Supreme Court in the Dean case on this point, is answered by specific statute: "When an intent to injure or defraud is necessary to constitute the offense, it is sufficient to allege an intent to injure or defraud generally, without naming the particular person, corporation or government intended to be injured, or defrauded." Code 1940, Title 15, Section 244.

On Rehearing.

BRICKEN, Presiding Judge.

Upon this application for rehearing counsel for appellant insists that the opinions heretofore promulgated in this case are

erroneous in several instances, and in the application renews and reiterates former insistences of error upon the original submission.

First: It is again contended that the act of the legislature under which the indictment was laid is unconstitutional. Upon this question we adhere to what has been said in the original and concurring opinions on this question, hence refrain from further discussion in this connection.

■ Second: It is strenuously insisted, and ably argued, that error prevailed in the action of the court in refusing written charge 3, to defendant. Said charge is as follows: "If there is a probability of defendant's innocence arising out of the evidence, you should acquit him." In our opinion as to this, and other refused charges, we stated: "In submitting this case to the jury, the trial judge delivered a full and comprehensive oral charge; and, in addition thereto, gave at the request of the defendant several written special charges. Thus, we think, every phase of pertinent law involved in this case, was properly given to the jury as instruction by the court. A number of special written charges were refused to defendant, several of which have been disposed of by what has been said hereinabove. We see no necessity to discuss in detail the remaining refused special written charges. We have, however, carefully examined all of them and are of the opinion that the court's oral charge, coupled with the given charges at request of defendant, fairly and substantially covered such of the refused charges that properly stated the law of this case." In the foregoing, especially as to refused charge 3, we are clearly sustained by the fact the court gave at request of defendant written charge 18, which reads as follows: "I charge you that the only foundation for a verdict of guilt in this case is that the entire jury shall believe from the evidence, beyond a reasonable doubt and to a moral certainty, that the defendant, Fred Newman, is guilty as charged in the indictment, to the exclusion of every probability of his innocence, and every reasonable doubt of his guilt, and, if the prosecution has failed to furnish such measure of proof, and to so impress the minds of the jury of his guilt, you should find him not guilty." This last quoted charge, in our opinion, not only fairly and substantially covered the proposition of law contained in charge 3, but as will be noted the charge (18) was highly more favorable

to defendant than the requested charge. The foregoing is conclusive of this insistence. However, while said charge has met the approval of the appellate courts, in many instances, as stated by counsel, there are decisions which hold that the charge is faulty and properly refused, for that, "it justifies an acquittal on a probability of innocence, while it must be a reasonable probability of innocence' arising involuntarily out of the evidence, or some part thereof, after a consideration of the whole by the jury." Buckhanon v. State, 12 Ala.App. 36, 67 So. 718; Hayes v. State, 21 Ala.App. 615, 110 So. 696; Adams v. State, 21 Ala. App. 15, 105 So. 714, certiorari denied In re Adams, 213 Ala. 570, 105 So. 715, 716; McClain v. State, 182 Ala. 67, 81, 62 So. 241. In Edwards v. State, 205 Ala. 160, 87 So. 179, 180, the Supreme Court (speaking through the late Justice Somerville) said: "It is difficult to understand why a defendant would wish to have the jury instructed that, 'if there is a probability of defendant's innocence, you must find the defendant not guilty,' when he is entitled to an instruction that he must be acquitted unless shown to be guilty beyond any reasonable doubt—a requirement far more rigorous against the state and far more favorable to the defendant."

■ Third: This insistence has reference to the action of the court in declining to grant defendant a continuance on account of the absence of defendant's wife, who, at the time of the trial, was sick and unable to attend court and testify in behalf of her husband. As to this the record shows the following: "Then and there the defendant offers a verified statement showing the illness of his wife and further offers a verified showing of her testimony, which said testimony being admitted by the State, and asks for a continuance of the case because of the absence of his wife. It is therefore considered by the Court and it is ordered and adjudged by the Court, that the defendant be and he is put to trial upon the admitted showing for his wife and he is denied a continuance because of her absence and to this action of the Court the defendant excepts." On page 112 of the record, in connection with the foregoing, the following appears: "Judge Sparks (appellant's counsel), at this point, offers the showing for the absent witness, Mrs. Fred Newman, and reads same to the jury, which is in words and figures as follows." Then follows the testi-

mony of said witness which covers about one and a half pages of the record. As to the foregoing we only need say that in this ruling complained of, the trial court acted within the discretion with which he was vested. It is the law, expressed in innumerable decisions, the granting or refusing continuances of trials is largely within the sound discretion of the trial judge, and his rulings in this connection are not revisable unless it affirmatively appears that a gross abuse of the discretion is shown. In Terry v. State, 120 Ala. 286, 25 So. 176, headnote 4, the court said: "Where the State admits the showing made by the defendant as to what an absent witness, who is shown to be sick and unable to attend court, would testify, if present, a motion for a continuance, made by the defendant on account of the absence of said witness, is properly refused." Here, as stated, the defendant had the benefit of the testimony of the sick and absent witness, prepared and presented by his able counsel; hence, under the rule, it cannot be affirmed that the court abused, in any degree, its legal discretion, nor can it be held that the ruling complained of was erroneously prejudicial to the substantial rights of the defendant. 6 Alabama Digest, Criminal Law, ⚎586.

As to the fourth insistence made on the application for rehearing, we have heretofore stated, and still adhere to the expressions in the opinion, that from a careful examination of the exceptions reserved to the court's rulings we find no error in any of them, to which exceptions were reserved, calculated to erroneously affect or impair the substantial rights of the defendant. Sup.Ct.Rule 45; Turner v. State, 29 Ala. App. 13, 15, 191 So. 392; Id., 238 Ala. 352, 191 So. 396. It would be impracticable to discuss in detail each of the exceptions reserved.

The fifth proposition is fully answered by the provisions of Section 244, Title 15, Code 1940. We adhere to the expressions in the concurring opinion by Simpson, Judge of this court, applying to this point of decision.

The insistence contained in the sixth proposition on application for rehearing is untenable and cannot be sustained. The State was under no duty to offer proof to the effect that this appellant, himself, actually set fire to the automobile in question, for the reason that it was unnecessary to show the physical participation of the accused in the act itself. McClain

v. State, 182 Ala. 67, 81, 62 So. 18, supra. Section 3196 of the Code 1923, Code 1940, Tit. 14, § 14, expressly provides: "The distinction between an accessory before the fact and a principal, and between principals in the first and second degree, in cases of felony, is abolished; and all persons concerned in the commission of a felony, whether they directly commit the act constituting the offense, or aid or abet in its commission, though not present, must hereafter be indicted, tried, and punished as principals, as in the case of misdemeanors."

The remaining two contentions on the application for rehearing are sufficiently dealt with and discussed in the original opinion, therefore no necessity appears for a reiteration here.

As stated in our first opinion, the controlling question in this case is whether or not there was sufficient corroboration of the testimony of the accomplice to meet the required rule, often announced. And as there stated: "Certainly, it must be conceded, if the testimony of the accomplice Brown, is true [and if this has been shown], this appellant should be called upon [and required], to bear the burden of his wrong doing, as testified to by Brown."

We adhere to the conclusion heretofore announced; and the application for rehearing is overruled.

Application overruled.